THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JACOB WEISS, JACOB SIMMONS and HARRY EPSTEIN, Appellants.

Argued December 10, 1942; decided March 11, 1943.

*Harry G. Anderson, Samuel Bader* and *Arthur Weiss* for Jacob Weiss, appellant.

*Rudolph Stand, Joseph D. Edelson, Vincent N. Donatone* and *Thomas II. Allen* for Jacob Simmons, appellant.

*George Z. Medalie, Louis B. Boudin, Louis Haimoff, Paul O'Dwyer* and *Sidney Elliott Cohn* for Harry Epstein, appellant.

*Frank S. Hogan, District Attorney* (*Stanley H. Fuld, Richard G. Denzer* and *David Riesman* of counsel), for respondent.

RIPPEY, J. Between nine and ten o'clock on the morning of May 8, 1929, one Hyman Leder, when about to enter the building in which his place of business was located on West 21st street in the city of New York, was struck with some instrument three times on the head by someone coming from behind with such force that there resulted a comminuted fracture of the skull contracoup and direct laceration of the brain, concussion and hemorrhage, as a consequence of which he died. The defendants were first indicted for the commission of the crime of murder in the first degree on January 22, 1942. Upon a superseding indictment filed April 28, 1942, they were tried in July, 1942, convicted and sentenced to death.

The theory of the People was that there was a criminal conspiracy or understanding among the defendants to attack Leder with a dangerous weapon in such a manner that his death might reasonably be expected to ensue and that the circumstances under which the attack was made indicated deliberation and premeditation and a design to effect his death. The People produced evidence, to which reference will be made later, designed to show that the conspiracy was hatched and nurtured to maturity during the two weeks previous to the homicide and that Simmons struck the fatal blows with an iron pipe some seventeen inches long and one and one-half inches in diameter, wrapped in paper and weighing about three pounds, while in the immediate presence of Weiss after Epstein had pointed out to them the intended victim. A bludgeon alleged to have been used in the killing was produced by the prosecution and received in evidence. Whether it was the instrument with which the killing was done, and, if so, whether it was a dangerous instrument were questions of fact submitted to the jury. The court correctly charged, in the event of an affirmative finding on those issues, that the jury might draw the inference that the killing was done with deliberated intent to kill on the part of the one who struck the blows from the character of the weapon used and of the wound inflicted, coupled

with his conduct before and after the blows were struck (*Foster* v. *People,* 50 N. Y. 598; *People* v. *Schmidt,* 168 N. Y. 568; *People* v. *Brengard,* 265 N. Y. 100). In the event, said the court, that Simmons wielded the weapon and Epstein and Weiss were co-conspirators and knew that he had the weapon, then they shared in his criminal intent. The court charged the jury that, if they should accept the theory of conspiracy as advanced by the People, they could find all three defendants guilty of murder in the first degree but, if they rejected that theory, they could not find Epstein or Weiss guilty of any crime and must acquit them.

Clearly the conviction of Epstein and Weiss on the record here must rest on a conspiracy among all of the defendants to kill Leder and upon knowledge on their part that Simmons had a dangerous weapon to be used to kill, or it rests upon no legal foundation at all. The prosecution relied upon circumstantial evidence to establish both those facts. In such circumstances, the facts from which the inferences are to be drawn must be established by direct proof: the inferences may not be based upon conjecture, supposition, suggestion, speculation or upon other inferences: the conclusion sought must flow naturally from the proven facts and be consistent with them all: the proven facts must exclude to a moral certainty every hypothesis except that of guilt or of the offense charged and not alone must all the proven facts be consistent with and point to guilt, but they must be inconsistent with innocence (*People* v. *Fitzgerald,* 156 N. Y. 253; *People* v. *Razezicz,* 206 N. Y. 249; *People* v. *Woltering,* 275 N. Y. 51). They are " of no value if consistent with either the hypothesis of innocence or the hypothesis of guilt. It is not enough if the hypothesis of guilt will account for all the facts proven " (*People* v. *Suffern,* 267 N. Y. 115, 127). Briefly as possible, we review the testimony produced and incidents in chronological order relied on to establish the ultimate facts.

1. In 1929 Hyman Leder and his son were manufacturers of pocketbooks and ladies' handbags with a place of business on the tenth floor of the building at 12 West 21st street in the city of New York. On the ground floor was an entrance to a hallway leading from the street to the elevators. They were members of an association of pocketbook manufacturers, one

of whose purposes was to deal collectively with The International Pocketbook Workers' Union concerning employees. They maintained a union shop and dealt directly and through the association with the union and operated under a contract between the union and the association which was about to expire on May 1, 1929. In 1929 they resigned from the association, the resignation being effective as of April 30, and decided to open a factory at Poughkeepsie, N. Y., where they would be outside the jurisdiction of the union. They moved their machinery from New York to the new factory location during the last part of April, 1929. It is the claim of the prosecution that therein lies the motive for the murder and furnishes one of the circumstances upon which the guilt of the defendants may be predicated.

The defendant Epstein was, at the time of the homicide, and had been for many years previously, a member of the union. In 1927 he was appointed and later elected an organizer for the union and continued as such to the end of 1929, and off and on thereafter. Previously he had been a member of the executive board. During that period from 1927 to 1929, one Charles Goldman was secretary and treasurer of the union and Abraham Shiplacoff was its general manager. Weiss had a restaurant business. Neither he nor Simmons was a member of the union or in any way connected with it. There is no evidence in the record that any one of the defendants was previously engaged in the business of assault or murder or that any one of them had a previous criminal record.

It is competent to prove motive in a prosecution for any criminal offense where reliance for conviction is placed upon circumstantial evidence. It is, however, a circumstance, like other circumstances, which must lead and tempt the mind to perform the criminal act. The circumstance must be proved in the same manner and lead to the conclusion sought in the same way as any other circumstance upon which reliance is placed. The motive inferred " must have some legal or logical relation to the criminal act according to known rules and principles of human conduct. If it has not such relation, or if it points in one direction as well as in the other, it cannot be considered a legitimate part of the proof " (*People* v. *Fitzgerald, supra,* pp. 258, 259). In the instant case, the motive must have been to

kill; otherwise "it cannot be considered a legitimate part of the proof." No such motive may be inferred from the evidence in this case on which the prosecution relies to establish motive in the case of either Weiss or Simmons. Neither had any union or other labor affiliation; of no interest to either, so far as appears, were Leder's union or nonunion affiliations or activities. As to Epstein, perhaps some "ingenious or imaginative mind" might "infer by some process of reasoning the existence of the main fact in issue" (*People* v. *Fitzgerald, supra,* p. 257), but the facts upon which the desired inference is based have no logical or legal relation to the murder according to ordinary rules and principles of human conduct. It is wholly remote and speculative that they necessarily led to a motive to kill Leder to the exclusion of every other hypothesis. More reasonable and logical is it to suppose that Epstein's motive was to bring Leder to terms or to teach him and others a lesson by available means not involving personal injury or death. Yet the trial judge submitted those facts relating to motive to the jury for consideration as against all the defendants on the ultimate fact of conspiracy to kill. There was no specific or separate charge on the subject of motive, if any, as affecting any one of the defendants separately and alone.

2. Epstein's job as organizer was a full time job. Among his duties were the organization of union shops and the investigation of the moving and changing of locations of shops. On the afternoon of April 27, 1929, as he was leaving union headquarters on West 21st street he noticed a truck loaded with pocketbook machinery. Returning to the union offices to procure the use of an automobile with which to follow the truck, since he did not know to what location the factory was being moved, he met Adam Rauch, known as "Kid Adams" and referred to by that name throughout the record, and told him a factory was moving and that he wanted to see where the machinery was going. He asked Adams if he wanted a ride. Adams claimed that he was an odd job investigator for the union to check up on nonunion activities. Having procured a car, Epstein, Adams and the chauffeur followed the truck to Poughkeepsie where Epstein learned the location of the new Leder factory. One of the truck drivers noticed the auto following the truck and complained to a policeman who questioned

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Epstein. The latter explained his errand, gave his card with name, address and business connection on it to the officer, one of the truck drivers entered Epstein's car, and they were allowed to proceed. Epstein rode on the front seat with the chauffeur; Adams and Whalen, the truck driver, on the back seat. The truck driver testified that Epstein told him that he was an organizer for the union, that Leder was going " up to the 918 (meaning $9.18 per week) town to scab," that " it would be nice in this town if a few more of the lousy bastards would go out like that. He said, ' Don't worry,' they will fix them for it * * * that the manufacturers were moving out of town to beat the unions * * * if those manufacturers keep going out of town and beat the unions, there would be something done about it * * * They are a bunch of lousy bastards * * *. He said he would fix the lousy bastard for it." Adams remembered no such remarks by Epstein and Epstein denied that he made them. The chauffeur was not called to the stand. The chauffeur and truck driver were strangers to Epstein. It is quite improbable and hardly consistent with human experience that Epstein should immediately after his contact with the policeman voluntarily and without invitation or apparent reason express in the presence of Adams and two strangers any intent to kill (*People* v. *Becker,* 210 N. Y. 274, 319; *People* v. *Lewis,* 275 N. Y. 33, 39). No reason is assigned or suggests itself why Epstein, the alleged brilliant master mind of the conspiracy, should deliberately place in the hands of anyone, at the outset of the alleged conspiracy, evidence upon which he might later be convicted of murder in the first degree.

3. Harry Leder, son of deceased, testified that at about noon of May 7, 1929, he heard someone talking to the electrician at the front end of the new factory, that he was expecting trouble, that he picked up a hammer on the table near him and started to go up to the front end of the factory when the fellow turned around and ran down the steps. He went over to the window and locked out and in front of the building this man was standing with Epstein, who pointed across the street, and the two separated and went in different directions. He had a glimpse of the man twice, each time for about forty seconds. He said he then called and complained to police headquarters. His identification at the trial of Simmons, whom he did not know,

as looking like the man with Epstein on the occasion thirteen years previous was dubious and unsatisfactory (*People* v. *Davino,* 288 N. Y. 423), and police headquarters at Poughkeepsie, which usually kept a record of complaints, had no record of any call from Leder.

4. Adams testified that on May 7, Epstein was in the offices of the secretary of the union which openly adjoined the offices of the manager; that he (Adams) was standing outside the door of the executive office with ten or twelve other men; there was talking outside and inside the offices; that Simmons and Weiss got off the elevator; that Goldman, the secretary, opened the door of his office and let them in and while they were walking in he heard a remark from someone whose voice sounded like that of Goldman that "We have got to get Leder," and that then the door was closed; that it was not Epstein who made the statement; that there were ten or fifteen men talking together in the offices and he heard some of the fellows say, "All right," but none of the defendants said that and he did not know who said it. Sometime after that, Epstein opened the door and let Simmons and Weiss out and they went down on the elevator. Adams did not hear any of the defendants say anything. Neither Goldman nor the manager of the union nor any one of the twenty to twenty-seven men who were inside and outside of the union offices and who, from Adams' testimony, it may reasonably be presumed were in an equally favorable position to hear and to know what was said and done, was called as a witness.

5. Kid Adams, William Shackman and Arthur H. O'Brien claimed to have been eyewitnesses to the murder.

Adams testified that on the morning of May 8, between nine and ten o'clock, he was walking along West 21st street and met Shackman, a member of the union, and saw Epstein, Simmons and Weiss standing on the north side of the street; that Epstein pointed his finger south across the street but he heard nothing said by any of them; that Simmons and Weiss then hurried across the street; that Simmons carried something under his arm, in his hands, and he pulled it out and struck a man across the street on the head, dropped the thing with which the blow was struck and ran away, with a man, whom he later identified as a letter carrier, following him; and that Weiss and Epstein disappeared in the crowd.

Shackman testified that he had known Epstein for twenty years; that he accidentally met Kid Adams and walked along 21st street with him; that he saw Epstein and two men standing by a parking place on the street; that he did not know the two men and could not identify them at the trial; that one of the fellows had a package wrapped up in a newspaper, but it was not Epstein; that the three were looking across the street and all of a sudden two of them made a fast walk, or they were running, he could not remember definitely, and one of them hit a fellow but he did not know who the fellow was he hit; that Epstein did not go across the street; and that the thing with which the man struck the other one was immediately dropped on the street after the blows were struck with a sound like an iron pipe.

O'Brien, a letter carrier, said that he was about to leave the hallway of a building after having delivered a parcel when he heard a girl in the hall say, " Here comes Mr. Leder," and as Leder was about to enter the building a man behind him struck him over the head with a package wrapped in paper; that Leder turned around and as he did so the man struck him a second time as he (O'Brien) came running out; that the man struck Leder a third time as he was sinking to the pavement; that the package fell out of the man's hand and hit the pavement with a sort of metallic sound and the man who struck the blows fled. At that time he observed blood and brain matter coming out of Leder's head.

Immediately after the homicide in 1929, the police made an investigation and called to headquarters and examined many persons. Epstein voluntarily appeared and told his story and there is no evidence of flight of any of the defendants except as to defendant Simmons at the immediate time of the homicide. Adams, Leder and O'Brien were rounded up and examined by the police. Adams and Leder testified that they immediately identified a photograph then produced by the police which was produced on the trial and admitted in evidence as a photograph of Simmons. Thirteen years later, at the trial, Leder identified Simmons *as looking like the man* he saw with Epstein in Poughkeepsie and Adams, Shackman and O'Brien identified him as the killer. Immediately after the killing, O'Brien said he reported the transaction to his superior, who, in turn, reported

it to the general post office, and they reported it to the police. About three days later detectives came around with pictures and he identified one of the pictures as that of the man he saw wield the weapon. In December, 1929, Simmons voluntarily appeared at the District Attorney's office with his then counsel, Caesar B. F. Barra, and appeared in a line-up at which O'Brien and various other possible witnesses appeared who received detailed instructions in regard to identifying any one who participated in the murder. O'Brien failed to recognize Simmons at that time and none of the other witnesses at the line-up was called to testify at the trial. O'Brien claimed that his silence was due to fear of personal injury if he told the truth but admitted no threat was made or duress exerted by anyone to compel silence. Shackman was a confessed liar and so thoroughly discredited that his story was of little significance in fact. Preliminary to the trial, he repudiated the story he finally told on the witness stand. He told at least four persons that he had lied to the District Attorney and attempted through a reputable attorney to persuade the police that the story was a complete fabrication. His excuse for silence for twelve years was to save the union and Epstein, but he, at the same time, denounced the union officials as racketeers and gangsters. Adams, without whose testimony, as the court charged the jury, there could be no conviction of Epstein or Weiss, said that he told the police in 1929 the same story he told on the witness stand except that he did not then tell that he witnessed the homicide, *first,* because he was not questioned on that point, and *second,* because he was afraid of a personal attack if he told the truth. He said there was no threat to injure him or duress exercised to keep him quiet. Although it was his duty to report to the union regularly, he said he made no report to the union of what he saw of the murder and made no statements to anyone else about it, not even to Shackman, until 1940, when, after a grilling, he finally told his story to the authorities. It was intimated by the defense that Adams was implicated in the crime which accounted for his certainty of details of the principal occurrences since " a man who has been guilty of a crime himself will always be able to relate the facts of the case " (*People* v. *Feolo,* 284 N. Y. 381, 388). It was only he who said he was present as a witness to the murder and not as a partici-

pant (Cf. *People* v. *Nitzberg,* 287 N. Y. 183, 187). It is said that his participation in the principal events and his character and business might readily direct suspicion to him and his motive for fabrication is plain. Adams' testimony is a story of a publicly planned conspiracy to kill which challenges credulity (*People* v. *Lewis,* 275 N. Y. 33, 39) and which we are not compelled to accept (*People* v. *Becker,* 210 N. Y. 274, 318).

Although the question of credibility of witnesses is usually one for a jury, in cases of murder in the first degree it is our duty to review all questions of fact and determine whether " the evidence is of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty beyond a reasonable doubt " (*People* v. *Crum,* 272 N. Y. 348, 350). In this case we must conclude that the evidence is not of that character and quality.

Aside from any question of the credibility of witnesses, we have attempted to point out that the criminal conspiracy was not proven since the inferences from the incidents upon which it was necessarily based did not meet the test required of circumstantial evidence, either singly or combined, by excluding to a moral certainty every hypothesis except that of guilt (See cases *supra;* and *People* v. *Paige,* 283 N. Y. 479). If Epstein made the statements attributed to him by Whalen, they are as consistent with the design and intent to discipline Leder by means not involving bodily injury as with a design to kill him. No inference could properly be drawn from the presence of Epstein or Simmons in Poughkeepsie, if either was there, that they or either one of them had a design to kill Leder. Had Epstein or Weiss been bound by the statements alleged to have been made at union headquarters, no inference was permissible from those statements that they indicated an intent to kill to the exclusion of all other inferences. Neither does the fact, if it be a fact, that Epstein pointed to Leder on the occasion of the killing exclude all inferences except that of an intent that Simmons should kill Leder. Nor does the mere fact that Epstein and Weiss were at the scene of the crime, if that be a fact, lead to any inference to the exclusion of all others that they were engaged in a criminal conspiracy to kill (*People* v. *Ligouri,* 284 N. Y. 309, 318). As concerns Epstein and Weiss, any intent or design to effect death must necessarily be inferred

from other inferences on the record here. Accordingly, there was lack of proof by circumstantial evidence of the criminal conspiracy (*People* v. *Galbo*, 218 N. Y. 283; *People* v. *Woltering, supra; People* v. *Razezicz, supra*) and there is no claim that there was any direct evidence of such a conspiracy. There was no sufficient evidence, direct or circumstantial, on which a jury might find knowledge on the part of Epstein and Weiss that Simmons had such a weapon as would warrant an inference that death would be likely to ensue from its use.

Among the various alleged errors on the trial which counsel for defendants urge upon us as grounds for reversal, we select two which cannot properly be passed by without comment.

1. The court charged that if Epstein and Weiss knew that Simmons had a dangerous weapon and it was their understanding that Simmons was merely to assault Leder with it, they would be responsible for the normal and necessary consequences of his act and it would not lie in their mouths to say that they intended to have Leder assaulted and beaten with the weapon but that they did not intend to have him killed. That charge constituted a serious error of law (*People* v. *Walker,* 198 N. Y. 329; *People* v. *Pignataro,* 263 N. Y. 229). Such a charge withdrew from the jury the necessity of finding an intent to kill. The existence of that essential element of the crime of murder in the first degree, although inferable in some instances from the fact and manner of killing, can never rest upon a presumption of law (*Stokes* v. *People,* 53 N. Y. 164, 179; *People* v. *Baker,* 96 N. Y. 340; *People* v. *Flack,* 125 N. Y. 324). By the charge the jury was virtually required to convict defendants if they conspired to commit an assault (*People* v. *Marendi,* 213 N. Y. 600).

2. In connection with the episode at union headquarters on May 7th, the day before the murder, to which Adams alone testified, there was nothing to show that Epstein was near the door when it was opened by Goldman and the threat " We have got to get Leder " made or that he heard it or was in a position to hear it or that, if he heard it, he acquiesced in the purpose of the statement, whatever the purpose behind it may have been. Adams' testimony that such a statement was made was inadmissible or, at least, not binding on Epstein (*People* v. *Larulia,* 140 N. Y. 87; *People* v. *Koerner,* 154 N. Y. 355, 374, 375,

379; *People* v. *Smith,* 172 N. Y. 210, 233), and, if not binding on Epstein, it was not binding on Simmons and Weiss as co-conspirators. Motion was made to strike out the testimony, the motion was denied and an exception was noted. Since the testimony was one of the most important items of evidence relied on by the People to establish intent and deliberation and design to effect death and the most vital link in the chain of circumstantial evidence to establish the crucial fact of conspiracy to kill, the erroneous admission and retention of the testimony present serious error.

It has been suggested that the conviction of all three defendants should be sustained since the jury might have found the defendants guilty of murder in the first degree solely on the testimony of eyewitnesses to the actual murder. Aside from any other objection that might be raised, that idea is necessarily based on the premise that the jury may have properly discarded the conspiracy theory on which the case is founded. Neither the District Attorney nor the trial judge subscribed to any such premise. The People do not rely upon any such premise and do not rest upon it on this appeal. In the opening of the brief of the learned District Attorney he says: " The theory of the prosecution was that the killing was committed pursuant to a conspiracy entered into by the defendant Harry Epstein, * * * and the defendants Jacob Weiss and Jacob Simmons." Finally the case was neither tried nor submitted on any such theory. The trial judge charged the jury, " It is the theory of the People that the assault of Leder was the result of a criminal conspiracy, understanding or combination between these three defendants, and that that conspiracy was a conspiracy to attack Leder with a dangerous weapon in such a way that the attack might and probably would result in his death. * * * The defense also denies that the People have shown facts and circumstances from which any logical and reasonable conclusion could be drawn that the death of Leder was the result of or brought about pursuant to a criminal conspiracy, involving them or any of them. The theory of the People with reference to the criminal conspiracy is based upon what is known in the law as circumstantial evidence. * * * Did these defendants, at sometime prior to the morning of May 8, 1929, conspire together to criminally assault Leder, or to kill

Leder, or both? The theory of the People is that they proved beyond a reasonable doubt by direct evidence, and by facts and circumstances from which only one logical and reasonable inference can be drawn, that the defendants, and all of them, sometime prior to the actual commission of the crime, had conspired together to assault and kill Leder, or to assault him.  *  *  * So your inquiry at this point should be, was there such a conspiracy or understanding between these three defendants, a conspiracy to attack Leder, to attack him with a dangerous weapon, and to attack him in the manner in which he was attacked so that it brought about his death?  *  *  * If you have a doubt as to the existence of any criminal conspiracy, any such criminal conspiracy having that purpose in mind, you must acquit the defendants Epstein and Weiss of the crime of murder in its first degree, and as to Simmons, I will come to him a little later. *  *  * And, of course, if you have a reasonable doubt as to the existence of such a conspiracy, you must acquit the defendants Epstein and Weiss of this charge.'' And during a recapitulation of the charge, after reiterating his instructions concerning conviction or acquittal under the conspiracy theory, the learned court said, '' If, on the other hand, you reject the theory of conspiracy as advanced by the People, you cannot find the defendant Epstein guilty of any crime, you cannot find the defendant Weiss guilty of any crime. You must acquit them both.'' Accordingly, we cannot consider or pass upon the guilt or innocence of these defendants or any of them on some theory that is not in this case.

The court charged that only in the event that the jury rejected the theory of conspiracy among the defendants should the jury consider the case against Simmons alone. In that contingency, the court defined the various crimes of murder and manslaughter and charged the jury that they might find him guilty of murder in the first degree, murder in the second degree or manslaughter in the first or second degree, according as they found him responsible for the various elements involved in such crimes, or they must acquit him. Under the charge, the two theories were essentially inconsistent and mutually exclusive. We do not pause to refer to the charge on the subject of the responsibility or lack of responsibility of Simmons for the homicide in the event the jury should discard the conspiracy theory. Nor need

we consider the sufficiency of the evidence to establish the guilt of Simmons with the conspiracy theory out of the case. The jury necessarily adopted the conspiracy theory since, without it, under the charge, Epstein and Weiss could not have been convicted. It was impossible for the jury to convict Epstein and Weiss by adopting the conspiracy theory and at the same time and on the same evidence convict Simmons by discarding the conspiracy theory. We must assume that the jury followed the instructions of the court which required them to acquit Epstein and Weiss if they should discard the conspiracy theory before convicting Simmons on the other theory. We cannot surmise or speculate to the contrary and must assume that all three defendants were convicted on the conspiracy theory. Since the judgments of conviction against Epstein and Weiss must be reversed as they are unsupported by the evidence, it follows that the judgment of conviction against Simmons must also be reversed.

The judgments of conviction should be reversed and a new trial ordered.

DESMOND, J. (concurring). I concur for reversal and a new trial as to all defendants, on the sole ground that the conviction of all three defendants was on the theory of a conspiracy to kill, and that such a conspiracy was not proven beyond a reasonable doubt.

FINCH, J. (dissenting). The People's case against all three defendants rests upon direct evidence by three eye witnesses, two of whom are good citizens of unimpeachable character. These three defendants, acting in concert, killed Hyman Leder by battering out his brains in broad daylight on a busy street in the center of New York City, as he was about to enter his factory.

The jury could have rejected all the circumstantial evidence and still there would have been ample evidence to sustain their verdict.

By reason of the verdict of the jury, we are entitled to view the evidence in the light most favorable to the People's case and to draw reasonable inferences therefrom.

In brief, the evidence shows that Epstein, an organizer of the union, planned and directed the murder of the employer

Hyman Leder in order to teach a lesson and act as a deterrent to all those employers who intended to move their factories outside of the jurisdiction of the local union. The jury chose to believe the direct evidence of the crime which was furnished by the three eye witnesses, which constitutes ample evidence to sustain the verdict of the jury, and, it is submitted, precludes the setting aside of this verdict as against the weight of the evidence.

The conviction of Simmons can rest solely upon the testimony of Arthur O'Brien, the letter carrier. Standing only a few feet away, he saw Simmons strike Leder three times over the head with an iron pipe about two feet long and weighing three pounds, with such force that Leder's "blood and brains and everything started to come off." That Simmons struck such blows with intent to kill is inferable from this testimony. Likewise, the testimony of Adam Rauch is sufficient to justify the verdict of the jury that Epstein and Weiss acted in concert with Simmons in the murder of Leder. Rauch personally knew all three defendants, having known Epstein for upwards of ten years. Standing a few feet from these three defendants, Rauch saw defendant Epstein point his finger across the street, marking Leder as he was about to enter his factory, and the other two defendants, namely Weiss and Simmons, immediately run across the street towards Leder, and Simmons strike the fatal blows while defendant Weiss stood by until the crime was completed. The fact that Epstein's command set in motion the killers, who immediately thereafter caused Leder's death with a murderous weapon, which Epstein must have seen in Simmons' hand before the assault is sufficient to sustain the conviction of Epstein. The case against Weiss rests upon the fact that when Epstein gave the command, Weiss ran across the street in company with Simmons, and stood by while the latter committed the murder. There is no innocent explanation of the actions of Weiss. The only normal and reasonable inference is that which the jury drew, namely, that Weiss intended to assist Simmons in killing Leder.

But it is said that these witnesses are not to be believed because, through fear of receiving the same treatment accorded to Leder, they remained silent about their knowledge of the murder, and on a previous occasion shortly after the crime failed

to point out the defendant Simmons to the police. Both witnesses explained their long-continued silence by testifying that they were afraid of gangster violence. This explanation is entirely feasible. The changes rung on this were properly addressed to the jury, and the evidence was ample to sustain their decision. If the testimony of such witnesses is to be declared unworthy of belief, crimes committed by organized criminals appear difficult of punishment. The testimony of Rauch is assailed because it is said that he had formerly been a successful prizefighter and, therefore, would not be afraid of gangsters. Even the most rugged physique is not protection against heavy iron pipes or bullets. The long-continued silence of these witnesses, induced as they testified through fear of gangster violence, is a factor to be taken into consideration in weighing their credibility, but it is not so inconsistent with what the jury have found to be the truth as to cause the Court to interfere with the decision of this evidence made by the jury.

Finally, the credibility of Rauch is attacked by surmising that it may have been he who committed the murder or participated in it. In other words, we are asked to reject the finding of the jury, supported by the testimony of three eyewitnesses, who in broad daylight and standing only a few feet away saw these three defendants, acting in concert, kill Leder, and moreover, to cast out this testimony by indulging in the surmise that Rauch committed the crime merely because the latter was present at the scene. It is submitted that thus to overturn the verdict of the jury upon mere speculation, unsupported by any evidence whatsoever, is not to accord due weight to the verdict of the jury. But in addition to the above direct evidence by eyewitnesses, there is further direct evidence of the participation of Epstein in the murder by the witness William Shackman. As shown above, the testimony of Shackman may be disregarded entirely by the jury and still, through the above testimony, there is sufficient to sustain the verdict of the jury. The testimony of Shackman is assailed heavily upon the ground that he had made prior inconsistent statements. But these prior inconsistent statements do not render the testimony of Shackman unworthy of belief by a jury, since Shackman offered a reasonable and plausible explanation of why he made these prior inconsistent statements. His explanation was his desire to avoid

hurting the union and Epstein. Since Shackman had long been a member of the union and had known Epstein twenty years, his reluctance to testify was reasonable and normal. At any rate, his explanation is not so unlikely that it does not lie within the province of the jury to decide his credibility. Shackman's credibility is strengthened because his testimony fits consistently into the testimony given by the other two eyewitnesses who are good citizens of unimpeachable character. His credibility is given added weight by the fact that he did not pretend to see all the details of the crime, as might be expected of a prevaricating witness, but rather he testifies to seeing only a few details of the occurrence, and which details are considerably less than either Rauch or O'Brien testified they saw. The total effect of the testimony of Shackman, if accepted by the jury, was to strengthen the case of the People against Epstein, which even without this testimony would still be sufficient to sustain the verdict of the jury finding Epstein guilty.

It is urged that evidence of this crime is incredible in that the defendants would hardly have planned a murder in so public a manner. But there is moving evidence that Epstein intended and planned the murder as an object lesson to other manufacturers who might be tempted to follow the example of Leder and move away from the city of New York so as to escape the jurisdiction of the union and the closed shop contracts.

The accounts of the three eyewitnesses of the murder are strongly supported by the evidence that Epstein, upon being taken into custody on the day of the murder, had in his pocket two receipts, one of which gave evidence of their nature by showing that it was given for the payment of money. One of these receipts was made out to " Jack Weiss," " Spunky," and the other to " Jackie Simmons." This evidence bears strongly on the motive of Weiss and Simmons to participate in the crime. The evidence preponderates in supporting the finding of the jury that the motive of Epstein, as an organizer of the union who included among his duties the organization of union shops and the investigation of the moving and changing of location of shops, was to make what happened to Leder an example of what would happen to others endeavoring to move outside of the city to escape the jurisdiction of the local union.

The circumstantial evidence fills out the background of the murder of Hyman Leder and is briefly summarized as follows. Harry Leder, the son of Hyman Leder, testified that Simmons came into the factory at Poughkeepsie (the reasonable inference being that he was looking for Hyman Leder) on the day before the murder, and that Simmons fled when Harry Leder approached. Looking out of the window, Leder saw Epstein and Simmons across the street from the factory. It is a fair inference that Epstein was here likewise directing Simmons. Harry Leder saw Simmons only on this one occasion, and at the trial, therefore, would not go beyond the statement that the defendant Simmons looked like the man who had been at the Poughkeepsie factory. For this reason his testimony is characterized as unsatisfactory. On the contrary, it would appear that Harry Leder is an honest witness who, having seen Simmons only fleetingly, would not testify to more than was within his power, even to avenge the death of his father. Contrasted with his identification of Simmons is his positive identification of Epstein whom he had known for a long time and consequently did not hesitate to identify positively.

The witness Rauch supplied also two other important items of circumstantial evidence. It was he who testified about the union conference, just prior to the consummation of the crime, when Simmons and Weiss visited the conference at union headquarters and entered the room of the secretary of the union where Epstein and some others were present, and where the secretary of the union was heard to say, "We got to get Leder," and received the response, "All right." Rauch also testified as to the command of Epstein to him to join Epstein in the automobile to follow the van moving Leder's machinery to Poughkeepsie, in order to see where it was to be located. No reason is suggested why his testimony in these respects is incredible. Indeed, the testimony of Rauch, as to the trip to Poughkeepsie with Epstein to spy on the location of Leder's new factory, is supported by the testimony of the truck driver Whalen, a witness of good repute who testified that Epstein told him that he was an organizer for the union, that Leder was going " up to the 918 (meaning $9.18 per week) town to scab," that " it would be nice in this town if a few more of the lousy bastards would go out like that." And that then Epstein said, " Don't

worry, they will fix them for it \* \* \* that the manufac-
turers were moving out of town to beat the unions,'' and '' if
those manufacturers keep going out of town and beat the unions,
there would be something done about it \* \* \* They are a
bunch of lousy bastards \* \* \* He said he would fix the
lousy bastard for it.''

There is thus ample evidence, both direct and circumstantial.
to sustain the conviction of all three defendants.

It is submitted that neither of the alleged errors of law war-
rants the setting aside of the verdict of the jury.

It is claimed that the court erred in calling attention to the
fact that Simmons armed himself with this iron pipe and then
struck Leder three times on the head and inflicted the wounds
which were testified to by the medical examiner, and then.
charged, '' If he did, and if the other defendants knew he was
armed with such a weapon, if it was their understanding to *so*
assault Leder with it, they would be responsible for the normal
and natural consequences of such an act, and it would not lie
in the mouth of anyone to claim that they intended to have Leder
*so* assaulted and beaten with such a weapon, but that they did
not intend to kill him.'' [italics not in original.] It is claimed
that the court thereby withdrew from the jury the necessity of
finding an intent to kill. A complete answer to this contention
is that the experienced trial counsel of defendants did not take
any exception or objection at the trial to this portion of the
charge. Secondly, the court had just charged, not once but many
times, that '' before you can convict anyone of the crime of
murder in its first degree, you must find that there was an
intent to kill Hyman Leder, and that that intent to kill was pre-
ceded by premeditation and deliberation.'' Also, at the end of
the charge, the court said, ''Well, gentlemen, finally, to reca-
pitulate, if \* \* \* you believe, further, that Simmons' act
was done pursuant to a criminal conspiracy to kill the deceased,
any person who was a participant in that conspiracy, and so
found by you to be, should be found guilty of murder in its first
degree.'' Thus, since this excerpt to which objection is now
made, is found in between instructions which were definite and
clear, that there must be an intent to kill, a reading of the charge
as a whole shows that the jury could not possibly have under-
stood the instructions differently than that Epstein and Weiss

could not be convicted of murder in the first degree unless they possessed an intent to kill and the requisite premeditation and deliberation. If there was any likelihood that the jurors understood the entire charge differently, certainly the experienced trial counsel of the defendants would not have allowed the excerpt in question to pass without objection and exception. The fact that counsel failed to object to this, or to remark upon it in any way, demonstrates cogently the insignificant and innocuous character of the alleged error. (cf. *People* v. *Johnson,* 185 N. Y. 219, 232; *People* v. *Flanigan,* 174 N. Y. 356, 372.) In fairness to the trial judge, he should be apprised by objection before an error of this character is relied upon to set aside the verdict of the jury.

The second error alleged is that it was improper to receive the testimony concerning the statement made in the office of the secretary of the union where the three defendants, Epstein, Simmons and Weiss were meeting with the secretary and apparently others two days before the killing. Rauch testified that when the door was opened he heard someone who sounded like Goldman say " We have got to get Leder," and thereafter heard someone in the room whom he did not identify, say " All right." Thereafter Rauch testified he saw Epstein open the door for Simmons and Weiss as they left. This testimony was received without objection or exception. Indeed on the cross examination of Rauch, the defense itself went into the conversation in the office and had the witness repeat the account he had just given upon his direct examination. This evidence thus being in the record without objection or exception, it was not error to deny the motion to strike out. Furthermore, it is settled that statements by one conspirator in furtherance of the conspiracy, to which the defendants were parties, are properly received, (*People* v. *Connolly,* 253 N. Y. 330; *People* v. *Becker,* 215 N. Y. 126, 148, 149.) In order to render such statements admissible, it was only necessary to establish a conspiracy which contemplated the killing of Leder, in which the defendants shared. (*People* v. *Becker,* 215 N. Y. 126, 149.) Likewise, statements of co-conspirators are admissible, even though all the conspirators are not on trial. (*People* v. *Connolly,* 253 N. Y. 330; *People* v. *Luciano,* 277 N. Y. 348.) The evidence shows such a conspiracy, beginning with the trip to Poughkeepsie and

ending with the murder. The concerted action of the three defendants subsequent to the meeting in the union office, shows the meaning of the decision to "get" Leder. We do not, however, have to rely on the foregoing to make the evidence admissible, for the court expressly charged the jury that it could not consider these statements unless they found that a conspiracy existed and that the defendants assented to these threats. Whether these defendants assented to these threats was a question of fact for the jury under all the circumstances presented by the evidence.

The judgments of conviction against the three defendants should be affirmed.

LEHMAN, Ch. J., and LOUGHRAN, J., concur with RIPPEY, J.; DESMOND, J., concurs for reversal and a new trial as to all three defendants in a separate memorandum; FINCH, J., dissents in opinion in which LEWIS and CONWAY, JJ., concur.

Judgments reversed, etc.