THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* LLOYD JACKSON, JOHN GREENE and WILTON MUNFORD, Appellants.

Argued October 11, 1943; decided December 8, 1943.

*Michael Kern* and *William Leibowitz* for Lloyd Jackson, appellant. The testimony of the witness Bey should have been rejected by the trial court as unworthy of belief; in any case it was not binding on defendant Jackson. (*People* v. *Weiss,* 290 N. Y. 160; *People* v. *Ledwon,* 153 N. Y. 10; *People* v. *Pignataro,* 263 N. Y. 229.) The testimony was insufficient to establish that defendant Jackson conspired or aided, abetted or otherwise participated in the killing of the deceased; in any event the verdict was against the weight of the evidence. (*People* v. *Fitzgerald,* 156 N. Y. 253; *People* v. *Weiss,* 290 N. Y. 160; *People* v. *Razezicz,* 206 N. Y. 249; *People* v. *Woltering,* 275 N. Y. 51; *People* v. *Suffern,* 267 N. Y. 115.)

*Joseph J. Zeiger* and *Ella Bernard* for John Greene, appellant. It was reversible error for the trial court to permit the jury to consider as against the defendant Greene the testimony as to the alleged motive of the defendant Munford to kill the deceased. (*People* v. *Weiss,* 290 N. Y. 160; *People* v. *Fitzgerald,* 156 N. Y. 253; *People* v. *Bennett,* 49 N. Y. 137.) It was reversible error for the trial court to permit the testimony of the defendant Munford to be used against the defendant Greene to show that the defendants killed the deceased and to show that the stabbing took place on the street. (*People* v. *Ledwon,* 153 N. Y. 10; *People* v. *Corbisiero,* 290 N. Y. 191; *People* v. *Golden,* 240 N. Y. 17; *People* v. *Van Zile,* 143 N. Y. 368; *People ex rel. Perkins* v. *Moss,* 187 N. Y. 410; *People* v. *Miller,* 247 App. Div. 489; *People* v. *Van Wormer,* 175 N. Y. 188.)

*Frederick L. Kopff, Rudolph Stand* and *Benjamin Glass* for Wilton Munford, appellant. The judgment should be reversed as the conviction of all three defendants was on the theory of a conspiracy to kill and such a conspiracy was not established beyond a reasonable doubt. The paramount issue as to the alleged conspiracy to kill was for the determination of the jury and the court committed prejudicial error in ruling as a matter of law, that there was a continuing conspiracy. (3 *Warren on Homicide,* § 318; *People* v. *Ohanian,* 245 N. Y. 227; *People* v. *Walker,* 198 N. Y. 329; *People* v. *Weaver,* 177 N. Y. 434.) For all that appears, the knife found by the officer inside an iron fence, may have been there for days, weeks, or months preceding the fatal night in question. There was not sufficient connecting testimony of any other kind which justified the admission in evidence of the weapon found by the officer. (*People* v. *Kinney,* 202 N. Y. 389; Wharton on Homicide 3d ed., pp. 945–6.)

*Thomas Cradock Hughes, Acting District Attorney* (Henry J. Walsh of counsel), for respondent. The appellants' guilt was proved beyond a reasonable doubt. (*People* v. *Van Tassel,* 156 N. Y. 561; *People* v. *Weiss,* 290 N. Y. 160.) Mere presence at the scene of the crime—of all of the appellants—cannot be detached from the previous declaration of the conspirators: " Let's kill him." (*People* v. *Woltering,* 275 N. Y. 51.) The jury was entitled to say that the story unfolded by Munford was an untruth and to find that the knife found inside the fence sur-

rounding St. John's Hospital was the knife with which he had stabbed the deceased.

LEWIS, J. The three appellants, Wilton Munford, Lloyd Jackson and John Greene stand convicted of murder in the first degree upon an indictment which charged that on May 26, 1942, in Kings County, they stabbed and killed Booker T. Eason.

The decedent operated a gambling room in his living quarters in a second floor apartment at the northwest corner of Herkimer Street and Albany Avenue in Brooklyn. As a prologue to proof of the homicide and as evidence of a motive for the crime, witnesses for the People testified that three days prior to the death of Eason, on a Saturday evening when the defendant Munford was present at the apartment engaged in a game of dice, Eason had accused Munford of cheating at the game and had compelled him to return his winnings to the board. Munford, testifying in his own behalf, gave a different version of that incident, it being his contention that he returned his winnings only when Eason, with knife in hand, was in the act of robbing him. There is a conflict in the evidence as to whether the defendants Jackson and Greene were present on that occasion. However, there is no evidence that either of them had any part in the altercation which then took place between Eason and Munford.

Passing to testimony descriptive of events of the following Tuesday night — the night of Eason's death — it appears that at about nine o'clock the defendants Jackson and Greene met the defendant Munford on the street and accompanied him to the Eason apartment. The People contend that Munford's return to the Eason game room on that Tuesday night was motivated by his desire to retaliate for the treatment he had received at the hands of Eason on the prior Saturday night. The three defendants deny that a vengeful purpose prompted them to go to the Eason apartment, their contention being that their presence there on Tuesday night was for the sole purpose of joining in a game of dice.

In view of the manner in which evidence of the events of that night was developed on the trial, the problem which the case presents is made more clear if reference is first made to portions of the defendants' evidence.

Munford was the only defendant who testified at the trial. From his testimony it appears that when the three defendants entered the Eason apartment on Tuesday night they went directly to the game room where they found three men, including Eason, standing about a table. As Munford advanced into the room he noticed that Eason started to " frown his face and opened his eyes and bite his lips ". He then saw Eason put his hands in his pockets " as if to open a knife  *  *  *  He put his hand behind his back  *  *  *." When Munford turned to leave the room he noticed Eason coming around the table toward him. Munford then said to Eason " Mr. Houseman can I speak to you? " Eason, who had a knife in his hand, then struck several times at Munford who in turn seized Eason's arm and, drawing his own knife, proceeded to " start cutting with it ". Munford admitted that in the melee which followed he plunged his knife into Eason's back,— his contention being that he did so to defend himself from Eason's attack. Eason then ran from the game room with the knife protruding from his back. In an effort to recover his knife Munford followed him through the adjoining living room and down the front stairs to the street, where the two men — Eason being in the lead — ran one block south along Albany Avenue to Atlantic Avenue where they turned to the east. In the meantime, as they had passed along Albany Avenue, and while Eason was still running, Munford had seen him reach up with his hands and " pull something out [and] throw it on the ground ". Having proceeded along Atlantic Avenue for a distance Eason stopped, turned and walked back to meet Munford. As the two men met, Eason — who had his own knife in his hand —, said to Munford, " Jumbo,  *  *  *  take my knife. I am sorry what I did. Please don't bother me no more ". Munford then took the proffered knife and Eason went on his way alone toward his home. He died at his apartment at about midnight, the cause of death being a stab wound. Munford denied that he cut Eason at any time after they left the game room in the latter's apartment. It is Munford's further testimony that he did not see either Jackson or Greene after leaving Eason's quarters until after Eason had handed him the knife. At that time, when Jackson and Greene had come up to a point near him on Atlantic

Avenue, Munford heard Jackson inquire whether he (Munford) had been cut. Munford admits that a day or two after the stabbing affray he learned that Eason's brother and friends were making threatening inquiries concerning his (Munford's) whereabouts. At that time, although he claims he was not then aware he had killed Eason, he fled to Baltimore because he was in fear for his own life.

The jury rejected the defendant Munford's testimony that the stab wound he had inflicted upon Eason occurred in the latter's apartment and that his act was one of self-defense against a knife onslaught by Eason. Instead the verdict indicates the jury's acceptance of the People's theory that the wound which caused Eason's death was inflicted by Munford at a point on Atlantic Avenue to which he had pursued Eason after the preliminary brawl in the game room and their exit from the apartment. The verdict would also make it appear that the jury credited the People's theory that the defendants Jackson and Greene conspired with Munford to bring about the death of Eason.

Evidence that Jackson and Greene were present in the game room on Tuesday night, during the encounter between Munford and Eason, and that they were present later on Atlantic Avenue near the point where Munford admits he met and talked with Eason, was not enough to establish beyond a reasonable doubt that they aided, abetted or participated in the killing. (*People* v. *Weiss*, 290 N. Y. 160, 170; *People* v. *Ligouri*, 284 N. Y. 309, 318.) If the judgment convicting Jackson and Greene of murder in the first degree is to be upheld, there must be evidence sufficient in law to justify the inference that they " counseled or induced or encouraged the crime ". (*People* v. *Swersky*, 216 N. Y. 471, 476.) We turn then to the *People's* case against the three defendants.

The only witness called by the prosecution who observed the encounter between Munford and Eason in the game room on Tuesday night was a man who from his position in the adjoining living room observed that during the altercation Eason had grasped Munford's hand which held a knife. That witness saw Jackson and Greene in the game room at the time but he swore that he saw no participation by them in the tussle which took place there between Munford and Eason. Indeed

it is his testimony that when the affair was at its height he heard Jackson say " Don't hit him no more ". From witnesses who were seated in the living room the prosecution adduced testimony that after the commotion in the game room had gone on for a time Eason ran out into the living room and down the stairs followed by Munford and later by Jackson and Greene. These witnesses saw a knife in Munford's hand — the only knife observed — as he passed through the living room. They saw no blood.

In an effort to establish what occurred after Eason fled from his house pursued by Munford, the People called the witness Bey upon whose testimony the prosecution places its chief reliance to sustain the judgment of conviction against each of the three defendants. Bey had gone to the Eason apartment at an earlier hour that night and had left the place about eleven o'clock. He testified that while he was " standing or sitting inside " his car, which was parked in front of the Eason apartment on Herkimer Street, he saw Eason run from his house. After a lapse of one or two minutes he saw three men come from the Eason house walking " abreast form " and following Eason at a distance of about thirty feet southerly along Albany Avenue. Bey swore that upon reaching the corner of Atlantic Avenue they all turned easterly and that he " did not see Eason after he turned the corner ".

On the first day of the trial when Bey was on the witness stand he was asked repeatedly — more than twenty times — whether he recognized or could identify the three men who came from Eason's house and followed him along Albany and Atlantic Avenues. In response to each of these inquiries Bey stated in substance that he was unable to recognize them, his voluntary explanations being " I can't describe the fellows because it was dark ", or " I did not notice faces because I was starting the car ". When persistent inquiries had failed to bring forth from the witness testimony leading to the identity of the three men who followed Eason, a recess was declared until the following day. When the court reconvened Bey was recalled to the stand for further direct examination and promptly identified the three defendants as the men he had seen follow Eason from his house. The witness testified further upon direct examina-

tion that after the three men had passed him at the curb in front of Eason's apartment he started his car and followed them easterly along Atlantic Avenue. Upon reaching Troy Avenue he turned to the south and followed them as far as Bergen Street where his tour of observation ended. There is no testimony from Bey that he saw Eason at any point along the several blocks through which he followed the three men. He does not say that he saw any commotion or that the three men stopped at any time during the course over which he followed them. Indeed Bey did not change his testimony, given on the previous day, that he did not see Eason after the latter had turned from Albany Avenue easterly into Atlantic Avenue.

We come then to Bey's last answer which is of vital importance to the *People's* case and in connection with which a statement was made by the Court which we believe was prejudicial to the defendants' rights: " Q. When you saw the three defendants come out of the house and go over from Herkimer Street to Albany Avenue, did you hear something said; yes or no? A. I did. Q. Tell us what you heard. Mr. Kopff [counsel for the defendant Munford]: I object to it. Miss Bernard [counsel for the defendant Greene]: Objection on the part of John Greene. Mr. Leibowitz [counsel for defendant Jackson]: I further object unless the witness can say which one of the defendants said anything. The Court: I will permit the witness to state what was said by any one of the three. If the statement came from any one of the three I will permit it irrespective as to whether or not he can tell which one said it. Mr. Leibowitz: I respectfully except. The Court: On the ground *there is a continuing conspiracy at that particular time.* Mr. Leibowitz: I object to that statement, if the Court please. The Court: You may have your objection and your exception. Q. What was said by any one of those three men? A. I heard one of the three say, ' There goes that nigger. Let's catch him and kill him ', and they started running after him.'' (Emphasis supplied.)

Whether a conspiracy existed among the three defendants to accomplish Eason's death became one of the principal questions of fact to be determined. In the absence of evidence, direct or circumstantial, that either Jackson or Greene stabbed Eason, we may assume from the verdict of first degree murder returned against each of the three defendants that the jury found as a

fact that they were guilty of a conspiracy to kill Eason. Upon that question of fact the testimony of Bey was of vital importance. We have seen that when first examined on the subject he repeatedly denied his ability to identify the three men who followed Eason from his house. He had stated definitely the reasons why he could not identify them. When on the following day Bey changed his former testimony and readily identified the three defendants, and then told the jury that he "heard one of the three say ' There goes that nigger. Let's catch him and kill him ' * * * ", he gave in that brief answer testimony which was of crucial consequence to the defendants. The answer itself came into the record only after counsel had objected to the question unless Bey could tell the jury " which one of the defendants said anything ". We cannot say that the jury's finding upon the important question of fact — whether the defendants conspired together to kill Eason — was not influenced by the language of the trial judge who in his ruling stated that he would permit Bey to testify as to what he heard " irrespective of whether or not he can tell which one said it. * * * On the ground *there is a continuing conspiracy at that particular time.*" We think the words italicized in the ruling last quoted above were prejudicial to the defendants' substantial rights. They related to an important phase of the case. They were spoken by the Court at a critical point in the trial and may well have led to the jury's finding upon a question of fact which was exclusively for its decision.

The People contend, and the jury must have found, that Eason was fatally stabbed by Munford at a point on Atlantic Avenue approximately seventy-five feet east of Albany Avenue. There was no direct proof to that effect. To fix that location as the site of the crime the prosecution relied upon circumstantial evidence. A police officer testified that on the morning after Eason's death he found a knife lying at a point seventy-five feet east of Albany Avenue within a grass plot behind an iron fence which runs along the northerly sidewalk of Atlantic Avenue. The knife was not identified as ever having been in the possession of Munford or any one else. Although no witness was called who had ever seen the knife before, except the police officer who found it, and despite the uncontradicted testimony of Munford, adduced by the District Attorney, that

the knife was not his and that it differed in several particulars from the knife he had used in his encounter with Eason in the latter's game room, it was offered in evidence by the prosecution and received under the ruling — "Admitted. Question of fact for the jury." The finding of an unidentified knife in a grass plot near Atlantic Avenue afforded no legal sanction for an inference that the crime with which these defendants are charged was committed nearby. The inference which the jury was permitted to draw — that the place where the unidentified knife was found marked approximately the site where Munford inflicted upon Eason a fatal knife wound — was based upon conjecture, not upon known or proven facts which are essential and alone give probative value to circumstantial evidence. (*People* v. *Weiss, supra,* p. 163; *People* v. *May,* 290 N. Y. 369, 371; *People* v. *Woltering,* 275 N. Y. 51, 61; *People* v. *Suffern,* 267 N. Y. 115, 127; *People* v. *Razezicz,* 206 N. Y. 249, 269–273; *People* v. *Fitzgerald,* 156 N. Y. 253, 258.)

These considerations lead us to conclude that the judgments of death entered herein should not be executed upon the present record. Justice to the defendants' rights requires a new trial.

The judgments of conviction should be reversed and a new trial ordered.

LEHMAN, Ch. J., LOUGHRAN, RIPPEY, CONWAY, DESMOND and THACHER, JJ., concur.

Judgments of conviction reversed, etc.