THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. ERNEST SUFFERN, BONOWITZ X. DAWSON and DAVID DYCHE, Appellants, Impleaded with Others.

(Argued March 11, 1935; decided April 16, 1935.)

*David L. Podell, Richard T. Greene, Mortimer Hays* and *Mortimer Feuer* for Ernest Suffern, appellant.

*Ulysses S. Grant* and *O. Arthur Stumpe* for Bonowitz X. Dawson et al., appellants.

*William Copeland Dodge,* District Attorney (*Irving Jay Tell* of counsel), for respondent.

HUBBS, J.  The defendants have been convicted of the crime of conspiracy under an indictment which charges that on or about the 20th day of February, 1930, they unlawfully and corruptly conspired to cheat and defraud one Ella Patterson out of property and to obtain from her by false pretenses 600 shares of the common stock of the Curtis Publishing Company; that in pursuance and furtherance of the said conspiracy the defendants organized on March 4, 1930, a corporation called General Industrial Foundation; that on the 4th day of June, 1930, the defendants, by falsely pretending that 2,000 shares of class A common stock and 10,000 shares of class B common stock of the General Industrial Foundation were of the same value as 600 shares of the Curtis Publishing Company

stock; and by falsely pretending that the said General Industrial Foundation was a going concern and was about to erect an office building on the plot of the Hotel Belmont, did induce the said Ella Patterson to deliver to the General Industrial Corporation 600 shares of Curtis Publishing Company stock; and afterwards did unlawfully cause the General Industrial Foundation to sell the said 600 shares and pay to them, the defendants, the proceeds procured by the sale of the said 600 shares of Curtis Publishing Company stock.

The trial court took from the consideration of the jury the allegation in the indictment·charging a false representation that the General Industrial Foundation was about to erect an office building on the plot of the Hotel Belmont. The case was submitted on the issues raised by the other allegations in the indictment.

The evidence shows that as early as 1928 the defendant Ernest Suffern conceived the idea of forming an organization that could furnish expert advice and financial assistance for a consideration to corporations that were fundamentally sound but badly managed and financed. He also had in mind that such a corporation would handle investments and obtain interests in new business ventures that could be assisted and their success thus made more assured. From 1928 to January, 1930, he endeavored to interest a number of different people in such a corporation. In December, 1929, the defendant Philip Barnes was introduced to Mr. Suffern. Suffern employed Barnes to work with him on the proposed new corporation. During the latter part of January Barnes told Suffern about his acquaintance with appellant Dawson; that Dawson was a mining man who had an interest with one White in Western Empire Mines which held leases on a mine known as the Royal Mine; and that it might be possible to make some arrangements with White and Dawson to use the Western Empire Mines as the initial asset or project of the new corporation contemplated by Suffern. The

result was that on March 4, 1930, the General Industrial Foundation was incorporated by Suffern and at a meeting of the directors held on March 10th, White transferred 100,000 shares of stock of Western Empire Mines to General Industrial Foundation, the new corporation, in exchange for 350,000 shares of the class B stock of the new corporation, 100,000 shares of which were to be returned by White to the General Industrial Foundation treasury and 250,000 shares of which were to be given to Suffern to be held for the benefit of Suffern, Barnes, White and Dawson. White also agreed to give the new corporation an option on 50,000 additional shares of Western Mines at $2 per share. The stock of the Western Empire Mines represented a one-fifth interest in the mine leases. The mine had previously been largely productive but it had been flooded during the war and the best paying veins lost, so that its future success was at best questionable and involved the expenditure of large sums of money to put it on a paying basis. White had already expended of his own and other people's money over $150,000 in its reclamation.

In the interim, between the time when appellant Suffern first met Barnes and the incorporation of the General Industrial Foundation, appellant Dawson employed Dyche to sell stock in Western Empire Mines on a commission basis. This occurred some time in January, 1930. At that time White, Dawson, Dyche and Barnes were all endeavoring to raise capital to be used by Western Empire Mines in developing and operating the Royal Mine. Dyche obtained from a friend of his the name of Mrs. Patterson, the complainant. He made an unsuccessful attempt to see her on February 21, 1930. He told White, Dawson and Barnes about her and on February 22d, White and Barnes called upon Mrs. Patterson and endeavored to sell her stock in Western Empire Mines. Mrs. Patterson had received, under her husband's will, large blocks of stock in the Curtis Pub-

lishing Company which he had requested her not to sell except upon the advice of certain men named in his will. She refused to purchase stock in the Western Empire Mines. Thereafter, between February 28 and March 7, 1930, Dyche made several calls upon Mrs. Patterson in an effort to induce her to reconsider her decision and also interviewed her lawyer at her request. She did not, however, purchase any of that stock.

In April, 1930, Dyche was employed as a stock salesman by the General Industrial Foundation to work under the direction of Barnes on a commission basis. Between April 6, 1930, and April 19, 1930, sometimes alone and sometimes in the company of Barnes, Dyche made further visits to Mrs. Patterson and endeavored to sell her stock of General Industrial Foundation. On April 18, 1930, Barnes, who was accompanied by Dyche, did sell to Mrs. Patterson 35 shares of General Industrial Foundation stock at $32.50 per unit. After the sale of this stock, Dyche took no further part in the negotiations between Barnes and Mrs. Patterson. On May 25, 1930, Barnes visited Mrs. Patterson and negotiated an agreement which was incorporated in a written contract dated June 4, 1930. Pursuant to that agreement, there was issued to her 2,000 shares of class A common stock and 10,000 shares of class B stock of the General Industrial Foundation and she deposited with the General Industrial Foundation 600 shares of Curtis Publishing Company stock to be used as collateral for loans. It was provided in the agreement that the Curtis stock should not be sold and that she should receive the dividends thereon.

It does not appear that the appellant Suffern knew Mrs. Patterson or had any conversations with any one about her prior to May 25, 1930, which was almost three months after the corporation was organized. At that time Barnes suggested to him the possibility of obtaining Curtis stock of Mrs. Patterson to be used as collateral and Suffern was present when the contract of June 4th was executed.

On June 18th further stock of the Curtis Publishing Company was turned over by Mrs. Patterson to General Industrial Foundation. An agreement was made on that day which was changed slightly by a third agreement dated the 19th, the result of which was that all the stock so deposited by Mrs. Patterson with General Industrial Foundation could be sold by the corporation. The corporation, however, was to continue to pay her the dividends on the Curtis stock or their equivalent and if she did not elect to take stock of the General Industrial Foundation in lieu thereof was obligated to repurchase the Curtis stock, if sold prior to the expiration of the agreement, through sale of such part of her General Industrial Foundation stock as might be required, and to retransfer to her the Curtis stock.

It should be noted that while the agreements of July 18th and 19th covered the 600 shares of stock referred to in the agreement of June 4th, and permitted a sale of the stock, whereas the first agreement prohibited a sale, the crime alleged in the indictment has reference only to the 600 shares covered by the June 4th agreement.

Until July, 1931, the General Industrial Foundation continued to pay to Mrs. Patterson the dividends on the Curtis stock. It appears that from the time when she made her first purchase of 35 shares, she was kept informed in a general way as to what was being done by the corporation and its officers, that she visited the offices frequently and had frequent consultation with its officers and employees and that she also corresponded with them.

After July 19th the corporation, which had previously been using the Curtis stock as collateral, began to sell the stock and put the money into the corporation treasury. The appellants each were paid substantial salaries, Dyche was paid a commission for the sale of the stock to Mrs. Patterson and also received compensation to the extent of about $1,600 in connection with the stock issued to her pursuant to the agreement of June 4th. There is no

sufficient evidence to show that appellants Suffern and Dawson ever received any money in excess of the salaries voted to them by the board of directors or that Dyche received other than what was paid to him in connection with stock sales and the stock issued to Mrs. Patterson. There is, therefore, no proof to support the charge in the indictment that after the sale of the 600 shares of Curtis Publishing Company stock, the appellants " did cause the said corporation called General Industrial Foundation to pay to them the said defendants the proceeds procured by the sale of the said 600 shares of stock of the said Curtis Publishing Company." It fairly appeared that the money received from the sale of the Curtis stock was expended by the corporation in the investigation of various enterprises which it was endeavoring to promote, in efforts to sell its stock and to provide financing for its various projects. It fairly appeared that Mrs. Patterson at the time she made her first sale knew that this corporation was a new one and that its purpose was to furnish engineering advice and assistance and to invest in corporations which it was assisting and developing. Mrs. Patterson says Dyche did not tell her about the interest of the corporation in the Western Empire Mines when he was negotiating with her and that Barnes did not when he made the first sale to her. Barnes, who was the principal witness for the State, testified before the Attorney-General that he told her about the interest of the corporation in the Western Empire Mines within ten days of the first sale and before he negotiated the transaction which resulted in the agreement of June 4th. On the trial he said he thought it was a later date, that he told her about the mine, but he would not deny that it was on May 25th, and admitted that his recollection was better at the time when he appeared before the Attorney-General. It is apparent from the testimony and also from a letter which she admitted having received from Barnes about January, 1931, that at some time prior to that date she was informed

of the interest of General Industrial Foundation in the mines.

It is the theory of the People that General Industrial Foundation was organized in pursuance of a plan to obtain Mrs. Patterson's stock. The only indications of the correctness of that theory must be deduced from the facts that Dyche, Barnes and White endeavored to sell her mining stock; that the new corporation did take an interest in the mine; that shortly thereafter Dyche and Barnes sold her stock in the new corporation; and that the only asset which the new corporation had at the time was the stock in Western Empire Mines. Mrs. Patterson admitted that when she bought the stock she knew what stock of the General Industrial Foundation had been sold. In so far as Suffern is concerned, there is nothing to indicate that he ever heard of Mrs. Patterson prior to the organization of the corporation. The only theory upon which it can be said that Mrs. Patterson was cheated or defrauded is that at the time when the agreement of June 4th was made the stock of General Industrial Foundation had no substantial value or at least that it was represented to have a value equal to the Curtis stock and did not in fact have that value, and further that the agreement constituted an exchange of stock. As to whether the stock had any value depends, of course, upon whether or not the stock of Western Empire Mines had value. If the latter stock had a value equal to the stock of the foundation issued in exchange therefor, then the new corporation was not damaged from a financial standpoint by that transaction and when Mrs. Patterson took the stock of General Industrial Foundation in exchange for her 600 shares of Curtis stock, if it be deemed an exchange, the corporation became possessed of an asset which made the stock issued to her of the value of that asset. The agreement of June 4th on its face was simply a transaction whereby in consideration of the issuance of certain shares of its own stock, the foundation acquired the right to use the Curtis stock as collateral. There is nothing illegal or improper in that

agreement and it would only be illegal in effect if used as a subterfuge to obtain possession of the Curtis stock. The only part which the agreements of July 18th and 19th and the subsequent sale of the Curtis stock occupy in the transaction, in so far as the crime charged in the indictment is concerned, to wit; cheating and defrauding the complainant by obtaining her stock, is to indicate the purpose in obtaining the stock in the first instance. The agreements of July 18th and 19th on their face are legal and, if not tainted with fraud, gave to the corporation the right to sell the stock and even if the agreements in question were part of a fraudulent scheme, these defendants could not be convicted of fraud but could only be convicted if they participated in a conspiracy by which the fraud was perpetrated. Barnes, the principal witness for the State and a defendant who has pleaded guilty, testified that there was no agreement between himself and any of the others to make any false representations. Mrs. Patterson testified that Dyche told her about the company except that he did not mention the gold mine. Dyche was not asked about his representations to her. Barnes testified that when the first sale of stock was made to her he did not mention the gold mine but he testified before the Attorney-General, as above mentioned, that within ten days of that sale and before the agreement of June 4th was negotiated he did tell her of the interest of the corporation in the gold mine. It does not appear that Dawson ever saw Mrs. Patterson until about July, 1931, over a year later. His letters along the latter part of July, 1930, indicate that he knew that Mrs. Patterson might furnish capital but there is nothing to indicate that he knew about any representations made to her. Barnes admitted at one place in his testimony that he did not mention the gold mine, but there is no proof that Suffern knew that fact. Dyche's connection with any negotiations with Mrs. Patterson ended with the first sale of stock to her and he had nothing to do with the formation of the corporation.

Mrs. Patterson's testimony and the loss which she suffered are conclusive proof that she made an investment which was wholly unwise, but her testimony fails to establish any conspiracy. Barnes' testimony, while tending to prove that there was an agreement that Mrs. Patterson was not to be told about the mining property, is belied by the fact that he testified before the Attorney-General that he did tell her and to some extent by the fact that while she testified herself that she did not know about it until a later date, she admitted receipt of the letter written much earlier mentioning the property and indicating that she had previous knowledge of it. The proof fails in the following particulars:

(1) There is no proof direct or circumstantial indicating that the corporation was formed in pursuance of a plan to obtain complainant's stock.

(2) There is no proof that the mining stock did not have a value so that it constituted a substantial asset of the corporation, at least as a project capable of development and of the type which the corporation was organized to develop. It also was shown that a large amount of money had already been invested in its improvement when it was acquired by the corporation; that it did show production during its operation by the corporation; and that it was thereafter operated profitably by others.

(3) There being no proof as to the value of the mining interests, there is no proof that in acquiring the Curtis stock, the stock of the foundation issued to Mrs. Patterson was not of a value equal to the Curtis stock.

(4) There is no proof that the foundation was not a going concern. It was organized for a particular purpose known to Mrs. Patterson and it was functioning along the lines for which it was organized.

(5) There is no proof that the defendants personally profited or that the money received from the sale of the stock was paid over to them as charged in the indictment.

It affirmatively appears that Dawson did not meet Mrs. Patterson until long after the event or that he had any

part in any misrepresentations or agreement to make misrepresentations as to the value of the stock of the foundation. There is no proof that Suffern met Mrs. Patterson before her first investment in the corporation or knew anything about what was said to her by Dyche or Barnes. While Dyche sold her the first stock, he had nothing further to do with sales or representations made to her and he was not a party to the transaction which resulted in her turning over the 600 shares. Whatever representation Barnes made or facts which he withheld are unimportant without proof that he and the appellants were conspiring together. The fact that he has pleaded guilty is no proof of the guilt of these appellants.

It is quite apparent that Mrs. Patterson was led into making an unwise investment and that she unwisely gave up her Curtis stock to be used to finance the foundation. It is probable that she was led into so doing by the enthusiasm of the defendants as to the probable success of the new corporation, but we believe that the record establishes that the appellants were honest in their expectations of success for the corporation and that the complainant was generally conversant with the fact that it was a new corporation, that its success was dependent upon projects to be developed and that it had to be financed from the outset. The object for which she transferred her Curtis stock to the corporation, namely, to permit it to obtain funds, would indicate that she must have known that the funds were to be used in the work of the corporation and that the only prospect of its being able to return her stock was it ability to make money. It would not make any difference whether the stock was sold or used as collateral. It could not have been returned in either event unless profit resulted. She expected those profits to develop, and so did appellants. We fail to see how it can be held that the evidence established beyond a reasonable doubt that complainant was cheated or defrauded, as the result of a conspiracy in the sale of the original block of 35 shares

or in the transfer of the 600 shares of Curtis stock. There is no evidence to connect Dyche with the agreement of June 4th, by which the 600 shares were obtained. While Suffern did join in the negotiation of that agreement, there is no proof of any misrepresentations on his part or agreement with others to misrepresent, and Dawson apparently had no connection with that transaction, his only connection being with the organization of the foundation. Regardless of the question of whether the indictment is or is not sufficient and regardless of the alleged errors in the charge, the conviction cannot be sustained for the reason that the evidence does not warrant a finding beyond a reasonable doubt that appellants were guilty of the crime charged. We have not overlooked the fact that where the charge is conspiracy it is not necessary as a matter of law that there should be direct, positive evidence, but that a jury is justified in finding a conspiracy where all the facts and inferences, although circumstantial, indicate the purpose and intention of the defendants to conspire to commit a crime and in furtherance thereof perform overt acts.

Circumstantial evidence to justify the inference of guilt must exclude to a moral certainty every other reasonable hypothesis. It is of no value if consistent with either the hypothesis of innocence or the hypothesis of guilt. It is not enough if the hypothesis of guilt will account for all the facts proven. (*People* v. *Razezicz*, 206 N. Y. 249, 273.) The most that could be said here would be that the hypothesis of guilt would account for the facts proven. We believe that as a matter of law they are consistent, also, with the hypothesis of innocence and, therefore, that the issue was improperly submitted to the jury. The defendants were doing nothing more, in their crude way, than was being done in every case where a management trust was organized, the purpose of which was to permit the management to use the money paid in by stockholders for the purpose of investment, with the expectation that

the ability of the managers would enable them to use the fund in such a way as to produce a profit to be paid to the stockholders by the way of dividends. It has never been suggested that such trusts, although based purely upon the expectation of the ability of the managers to so use the funds of the stockholders as to produce a profit, constituted illegal transactions. Some of those trusts have not proved to be advantageous to the stockholders. In many instances such failure has not resulted from lack of ability in the managers but from the financial depression following the organization of such trusts. If the defendant Suffern and his associates honestly believed that their great ability would enable them to accomplish the purposes which they had in view, and they sold the stock of the corporation to carry out that honest purpose, and the purchasers of the stock knew of the purpose, there could be nothing illegal in such sales. Of course, the first assets of all such corporations consist of the first moneys received for stocks sold.

The judgment of the Appellate Division and that of the Court of General Sessions should be reversed and the indictment dismissed.

CRANE, Ch. J., LEHMAN, O'BRIEN, CROUCH and LOUGHRAN, JJ., concur; FINCH, J., not sitting.

Judgments reversed, etc.