■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HAROLD EISENMAN, Appellant.—Appeal by defendant from a judgment of the County Court, Nassau County, rendered February 21, 1975, convicting him of manslaughter in the second degree, after a nonjury trial, and imposing sentence. Judgment affirmed. No opinion. The case is remitted to the County Court, Nassau County, for proceedings to direct appellant to surrender himself to said court in order that execution of the judgment be commenced or resumed (CPL 460.50, subd 5). Hopkins, Acting P. J., Latham and Brennan, JJ., concur; Shapiro, J., dissents and votes to reverse the judgment and to dismiss the indictment, with the following memorandum: The indictment under which defendant was tried and convicted charged him and his codefendant, Mrs. Fern Salica, the mother of the deceased two-year-old infant, Diane Salica, with the crime of manslaughter in the second degree in that each of them, aiding and abetting the other, on November 30, 1973, "recklessly caused the death of Diane Salica * * * by striking her about the body with their hands causing injuries resulting in death on the 1st day of December, 1973." The indictment was severed and defendant's trial was

---

held first. At the conclusion of the nonjury trial, the court, in finding defendant guilty of manslaughter in the second degree, stated: "The testimony of the experts indicated that the average five or eight-year old child could not have caused the injuries that resulted in the death of the child. My observations of the siblings, John and Denise Salica, indicated that they were of slight build, small in stature and on the frail side; and I find that they were incapable of inflicting the injuries which caused death in this case. I recognize that an infant of even two or three years of age could have caused, could cause injuries that might result in death, such as a stabbing or a smothering. However, the particular injuries in this case, the laceration of the liver and of the kidney, could not and were not caused by the decedent's siblings, but were, in fact, caused by the defendant." Since the principal issue is whether the evidence was sufficient as a matter of law to justify the conviction, and, as my colleagues hold that it is, I find it necessary to analyze the evidence. Two of the police witnesses testified that on November 30, 1973, at about 11:17 P.M., they received radio notifications that a child had stopped breathing at 127 Quebec Road, Island Park. They responded to the notification and, when entering the door of what was identified as the residence of Fern Salica, the codefendant, they were met by defendant, who was on the staircase just inside the door; defendant told them, "She's upstairs. I was just teaching them karate". When the officers went up the stairs into the living room they saw the decedent, Diane Salica, lying in the middle of the living room floor. Her skin was blue and she had marks about her face and stomach. She wore a T-shirt and pajamas, with the T-shirt pulled up to her lower chest. She had a bite mark on her face. Her mother, the codefendant Fern Salica, was at the far end of the living room. The officers attempted to administer mouth-to-mouth resuscitation. When the baby did not respond, they took her to the Long Beach Memorial Hospital. A third police officer, Sergeant Milford, also responded to the call and met the first two officers as they were leaving the Salica home to take Diane to the hospital. He went with them and there met defendant, who said to him, "We were teaching the baby Karate, teaching the kids Karate." Later, at about midnight, a fourth officer, Detective Eberhardt, went to the hospital, spoke to the doctor treating Diane in the hospital, viewed her bruises and lacerations, conversed with Mrs. Salica and questioned defendant after reading him his rights. Defendant stated that neither he nor Mrs. Salica ever struck the child. When asked how she had sustained her injuries he stated that he had heard that the deceased had fallen down the steps two or three days prior to the incident. At 1:17 A.M. on December 1, 1973 Diane was pronounced dead. Thereafter defendant was taken to the police precinct where he was informed by Detective Frank Fehn of the death of Diane. He was then apprised of his rights and questioned in the presence of another detective, Joseph Brand. Defendant told the police that he had arrived at the Salica dwelling on November 30, 1973 at about 7:00 P.M., that he had dinner, watched television with the three Salica children, and that later, Denise and John, the older children, on his direction, along with Diane, had practiced karate. At about 9:00 P.M. Diane was put to bed as she was crying and not feeling well. John went into the bedroom. Defendant heard something fall to the floor; he told John that that was enough and saw that Diane had vomited and wet her diaper. Fern changed the diaper. Later, at about 10:30 or 11:00 P.M., defendant went into the bedroom and found the baby's color improper. He tried to revive her by putting ice cubes on her face; when he found that he could not he called the police. Defendant also told Fehn that he had been at the Salica residence on Thursday, November

29 and had practiced karate with the children that evening. He also said that he had never struck the child. Detective Joseph Brand testified that he went with Detective Eberhardt to the Long Beach Hospital at about midnight on November 30 and was present when Detective Eberhardt interviewed defendant there at about 12:15 A.M. He heard defendant tell Eberhardt that the cause of Diane's injuries, as told him by Fern Salica, was a fall down the stairs a few days before. This witness was present when Eberhardt told defendant that Diane was dead and read him his rights. When Fehn asked defendant what had happened, he said, "I was teaching the kids karate" or "the kids were practicing karate", and that the baby had fallen down the stairs a couple of days before. Defendant stated that he had once spanked the baby when she was bad, but that he had not hit her hard. After Detective Fehn left the office at about 2:00 A.M., Detective Brand continued to talk with defendant, who told him that prior to November 30, 1973 he had taught the Salica children karate, how to make a fist, and that he had told them to practice on each other. At various times when he was at the house Denise and John would push Diane to the floor and she would get up. Defendant stated that at various times he would poke Diane in the stomach in order to have her identify parts of her body, such as the stomach, eyes, nose and mouth. Defendant repeated to Brand what he had told Eberhardt as to his November 30 visit to the Salica home, though he apparently added that when the diaper was changed he observed many bruises on Diane's stomach; Fern had told him "that the kids had been poking her in the stomach too much." Defendant also told Brand at this point that he knew that he, as well as Fern and the kids, had been too rough on Diane. The final police witness was Detective Douglas Escher, who spoke to defendant in the hospital corridor before Detective Eberhardt had. Defendant told him that he wasn't sure what had happened; that the two older children had been punching the deceased, and that he had been showing the children various types of karate punches. Thus, the police testimony contains no admissions by defendant that he had struck the decedent or even that he had practiced karate on her, other than his statement that he had once spanked her and had poked her in the stomach in order to have her identify parts of her body such as the stomach, eyes, nose and mouth. His statements to the police at the Salica home and in the hospital were that he was "teaching them karate". Even the one variant of this statement, made to Milford, "We were teaching the baby karate, teaching the kids karate" is not an admission that he struck the deceased child. There was medical testimony from four experts, three for the People and one for the defense. The three medical witnesses for the People agreed that the deceased child was an example of the battered-child syndrome and that the cause of death was hemorrhaging resulting from laceration of the liver and kidney from the impact of a heavy propelling force applied to the infant's abdomen, forcing those organs against the backbone and lacerating them. These three medical witnesses also agreed that there were marks on Diane's right abdomen area over the hip region and inferior to the rib cage which could conceivably have been the outward signs of the source of injury to the liver. There were recent bruises which could have been caused by the poking of a finger. The two doctors who performed the autopsy also testified that a finger-poking injury which would cause the laceration of the liver could not have been done by a five- or eight-year-old child. While the witness who performed an autopsy on the deceased child, Dr. Daniel P. McCarthy, a Deputy Medical Examiner of Nassau County, testified that the injury to the kidney was inflicted by a significant, heavy, driving, propelling

force inflicted over the left back in the area of the lowest portion of the rib cage, the Deputy Chief Medical Examiner of Nassau County, Dr. Minoru Araki, who was present at, and participated in, the autopsy of the decedent, testified that the kidney injury was produced by a blunt force applied either anteriorly, that is, across the upper left abdomen, or posteriorly across the back. He and Dr. McCarthy agreed that they could point to no external injury which resulted from the infliction of the force to the kidney and that such a force could easily fail to leave exterior marks. Both doctors agreed that the external evidence of the source of the liver injury could be seen in the form of the three bruises on the lower right abdomen of the child and that they evidenced recently inflicted pokes directed at the liver. Dr. McCarthy testified they were inflicted between two and a half and three hours prior to death. Dr. Araki testified they were inflicted no more than three or four hours prior to death. Dr. McCarthy also testified that some of the marks on the child's body were several days old, though the three he identified as the source of the liver injury were recent. He identified one of the older healing abrasions on the infant's back as several days old, though the three he identified as the source of the liver injury were recent. He identified one of the older healing abrasions on the infant's back as several days old, "three to five, maybe seven days." Some could have been as much as a week or two old. The three recent markings were, in his opinion, not caused by an instrument or stick because their edges were not crisply defined as would have been the case had they been inflicted with an instrument. Both of the witnesses rejected the theory that Diane's liver and kidney injuries were the result of the heart massage given her by the attending physician in the hospital emergency room, one of the possibilities suggested by defendant's expert medical witness, Dr. Baden. Relevant at this point is a discussion of the testimony given by a friend of the mother, Susan Jarvis, who had known the Salica family for three years and had visited them two or three times a week. She testified she had seen Diane and Fern on November 21 at their home and that she then noticed that Diane had a few bruises on her forehead. When she saw Diane two days later, the bruises were clearing up; on Monday, November 26, when she saw Diane again, she didn't notice any bruises. On November 29 she again visited the Salicas and had occasion to change Diane's diaper; she noticed no bruises on her lower body from the belly button down or on her buttocks. She also saw the Salicas on the morning of November 30, 1973 at the Salica home and, although Diane had a bite mark on the right side of her face, she had no bruises. Her testimony as to the absence of bruises on Diane on November 29 is in flat contradiction to the testimony of Drs. McCarthy and Araki as to the presence of bruises which were several days old on Diane's body when they performed the autopsy on her. Defendant's expert witness, Dr. Michael Baden, disagreed with the People's experts. It was his opinion that the deceased child's injuries could have been inflicted by an instrument or by a hand; that such injuries could have been inflicted by a child of five or of eight; and that the marks on the lower portion of her abdomen did not represent the injuries which caused the laceration of the liver because they were too low to have caused the liver injury. He also believed that the abdominal bruises were at least a few days old while the liver injury was very fresh. His opinion was that the liver and kidney injuries and internal hemorrhaging could all have resulted from the cardiac resuscitation and that the child's coma was caused by a concussion complicated by bleeding into the skin due to a condition of multiple bruises combined with the child's vomiting. While it may readily be conceded that the greater weight

of the evidence suggests that the deceased child's injuries were not caused by her brother and sister, neither the testimony of the medical witnesses for the People nor that of the various police witnesses establish either directly or circumstantially that defendant was the one who inflicted those injuries. Necessarily, therefore, we must now consider the statements of the only alleged eye witnesses to the occurrences with which defendant is charged— Diane's five-year-old brother, John Salica and his eight-year-old sister, Denise, both of whom gave *unsworn* testimony as to the happenings of November 30 and the day before. John testified that defendant on one night had punished Diane by putting her in the corner when she would not get a ball he had thrown to her. John also said that when he peeked into the bedroom on the night of November 30 he saw his mother hitting Diane on the arm and in the stomach. He also stated that on the night the policemen came and took Diane away, defendant was teaching him karate and was kicking Diane and told them "to kick Diane harder and harder and harder" and that "once he took off his shoes and kicked her." John then denied that this occurred on the night the policemen came (November 30, 1973) but said it had occurred on "the night King Fu was on television" (presumably November 29). He then further contradicted himself when he stated that just before the policemen came to take Diane away in the ambulance he and Denise, *but not defendant,* were practicing karate with Diane and "doing the karate". He also testified that defendant had not poked Diane. He said that on the night of the baby's death his mother took Diane out of the living room because she threw up on the rug; when he saw his mother change Diane she had bruises on her stomach. On cross-examination he again contradicted himself, stating that he remembered telling defense counsel and others, his mother and father and grandmother, *that he never saw defendant hit the baby on the night the police came and that what he had told defense counsel was the truth.* He also remembered telling the policeman that nobody was hitting Diane that night and affirmed that everything he told the policeman was the truth. It is thus clear that John Salica's unsworn testimony on the subject of defendant's hitting of Diane on the night of her death was so contradictory in every major detail as to be of no evidentiary value whatever. Denise Salica, Diane's eight-year-old sister, testified that on the night the policemen came and took Diane to the hospital, defendant and her mother were at her house and that she and her brother were "doing karate on Diane" and had been told to do so by defendant. She testified that a "couple of nights before Diane died" she had seen defendant practice karate on Diane, kicking and punching her. She had heard Diane scream "the night before she died and a couple of nights before." She stated that Diane was screaming the night before she died "because they hit her and punched her a lot", adding that defendant "punched her and hit her and also put her in the corner." On that same night, she said, defendant punched and kicked Diane in the stomach. She also stated, in response to questioning by the People, that on the night she died Diane had been told by defendant to go into the corner "because she wouldn't hit me and my brother back." *But she said also that on the night the baby died she did not see either defendant or her mother hit the baby.* She said that on the night Diane died she and John were "doing karate" on each other and on the baby with their hands and feet and that defendant told her to do it harder. Later that night defendant and her mother put the baby in the bedroom. John went into the bedroom a few times; the last time he came out he said that the baby wasn't feeling well. She said that while they were doing karate on the baby on the night she died, John had his

shoes on but she did not. The baby cried and defendant picked her up and put her in the corner. *On cross-examination Denise said that on the night the baby died she never saw defendant hit, punch or kick the baby. She also said that she remembered the police asking her whether defendant had hit the baby in the stomach at all and that she had said she didn't know and that that was the truth.* She also said that while defendant had been at their house on Thursday and Friday night (the 29th and 30th of November), he had not been to the house for about a week prior thereto. This makes it clear that he could not have been responsible for the old, partially healed bruises on the baby's body. Denise's testimony, like John's, is so contradictory in every important detail that it cannot reasonably be said to support the inferences necessary to sustain the conviction, that is that defendant inflicted the blows which lacerated Diane's liver and kidney and caused the internal hemorrhages which brought about her death. Neither the testimony of the children nor that of the other witnesses, police and medical, serve to negate the reasonable inferences that the mother of this battered child, or her older siblings, could well have inflicted the injuries which caused her death, injuries which, according to the People's medical witnesses, would have had to be inflicted on the night of November 30, some three or four hours prior to the child's death at 1:17 A.M. on the morning of December 1, 1973. Certainly the testimony in this record, which I believe I have fairly summarized, does not either directly or circumstantially justify the conviction of defendant, for there is no credible proof that he inflicted the injuries which caused the death of Diane Salica. The testimony that defendant had struck the decedent was to the effect that he had struck her on the night of November 29 with blows which, according to the People's medical testimony, could not have been the cause of death. What testimony there is, from John, as to the decedent's being struck on November 30 is to the effect that she was struck by her mother. The evidence on which the conviction rests is the fact that defendant was present in the house when the fatal blows were struck, that he was strong enough and skilled enough in karate to have inflicted those blows, that he had been teaching the children karate on his previous visits and, by his statements to the police, that, presumably on the night of the fatality, he had tried to get the older children, in "doing karate", to hit the baby harder than they did. But all of these facts do not add up to proof of defendant's guilt of manslaughter and in no way negative the strong possibility that the fatal injuries could have been inflicted by the mother of this child—a child who was recognized by the People's medical witnesses as a victim of the battered-child syndrome and some of whose injuries—the partially healed bruises and the bite on the cheek—were clearly attributable to her mother. I do not believe that it can be disputed that defendant's conviction clearly rests on circumstantial evidence. Therefore, "In such circumstances, the facts from which the inferences are to be drawn must be established by direct proof: the inferences may not be based upon conjecture, supposition, suggestion, speculation or upon other inferences: the conclusion sought must flow naturally from the proven facts and be consistent with them all: the proven facts must exclude to a moral certainty every hypothesis except that of guilt of the offense charged and not alone must all the proven facts be consistent with and point to guilt, but they must be inconsistent with innocence *(People v Fitzgerald,* 156 NY 253; *People v Razezicz,* 206 NY 249; *People v Woltering,* 275 NY 51). They are 'of no value if consistent with either the hypothesis of innocence or the hypothesis of guilt. It is not enough if the hypothesis of guilt will account for all the facts proven' *(People v Suffern,* 267 NY 115,

127)" *(People v Weiss,* 290 NY 160, 163). In *People v Wachowicz* (22 NY2d 369) the court re-emphasized the circumstantial evidence rule when it said (p 372): "The rule governing the sufficiency of circumstantial evidence as this court has restated it many times is (a) that the hypothesis of guilt should 'flow naturally from the facts proved, and be consistent with them all'; (b) the facts proved must all be consistent with guilt and inconsistent with innocence and exclude 'to a moral certainty' every hypothesis but guilt (e.g. *People v Bennett,* 49 NY 137, 144; *People v Harris,* 136 NY 423; *People v Razezicz,* 206 NY 249; *People v Woltering,* 257 NY 51, 61; *People v Eckert,* 2 NY2d 126). The rule, as Judge Hubbs noted in *Woltering,* has been 'repeatedly reiterated by this court' ." In *People v Benzinger* (36 NY2d 29), the Court of Appeals reaffirmed the rule previously enunciated by it with respect to convictions based exclusively on circumstantial evidence when it said (p 32): "the rule draws attention to the fact that proof by circumstantial evidence may require careful reasoning by the trier of facts. By highlighting this aspect, the rule hopefully forecloses a danger legitimately associated with circumstantial evidence—that the trier of facts may leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree (see *People v Cleague, supra,* at p 367)." Here, there has been a leaping of logical gaps. Why would this occasional visitor to the mother of the deceased infant, one as to whom no evidence has been developed of cruelty toward children generally, who was not a member of the family and who clearly was most friendly and considerate to the deceased child's siblings in teaching them self-defense, be so reckless of the baby's safety as to practice karate on her to the point of endangering her life? Why would he join in the battered-child syndrome with the mother? And how can we overlook the fact that there is no real evidence that he even struck the deceased child on the evening of her death when, according to the People's other testimony, the injuries causing her death had been inflicted at that time? Looking at this record in another way, I think it must be conceded that without the unsworn testimony of the two children there would not only be insufficient proof but that there would be no proof warranting the submission of the manslaughter charge to a jury. Adding their completely contradictory statements to the record may warrant a *suspicion* that defendant was somehow responsible for the death of baby Diane, but suspicion, no matter how strong, is not proof, and, as a matter of law, does not present a question of fact sufficient to pass muster under the "beyond a reasonable doubt" rule when taken together with the rules under which circumstantial evidence must be weighed. Although I find no merit in any of the other contentions raised by defendant, for the reasons above set forth the judgment appealed from should be reversed and the indictment dismissed.