Wachtler, J.
The defendant has been convicted of manslaughter in the second degree for recklessly causing the death of Clifford Mendell. On this appeal he claims that the conviction should be set aside, and the indictment dismissed, because the proof is insufficient, as a matter of law, to establish his guilt beyond a reasonable doubt. In the alternative he argues that there should be a new trial because the court erred in permitting evidence of other crimes to be admitted at the trial.
It is undisputed that the defendant and Clifford Mendell were long-time friends. They had met as teenagers. They later joined the Army and served together in the same unit in Germany. They both returned to New York City and continued to reside, not far apart, in Queens County. Mendell joined the merchant marine, as a seaman; the defendant became a construction worker. Nevertheless they continued to meet whenever Mendell returned from a voyage. It is conceded that this was a close relationship which had lasted for approximately 20 years.
In February of 1973 Mendell, who had recently returned from a trip to the mideast, was living with Gale Dawson at her house in Flushing. According to the defendant, Mendell called him on the afternoon of February 3 and told him to "Drop on over, have a few drinks with me. I’m having some people over tonight.” The defendant arrived at the Dawson home at approximately 7:30 that evening. Mendell met him at the door and brought him into the living room where Gale Dawson, Charles Burthardt, Mendell’s shipmate, and Carol Tsiamis, Gale’s friend, were having drinks. The defendant had met them all on prior occasions. After a brief exchange of greetings, Mendell led the defendant into the kitchen. They remained there for approximately one and one-half hours.
During most of this time the others remained in the living room where they were unable to hear what was being said in the kitchen. At approximately 8:30 Burthardt passed through *55 the kitchen on the way to the bathroom. On the return trip he heard a portion of the conversation. He stated that "they were discussing things in general and something about a little cocaine * * * and there was a $500 discrepancy.” They were "speaking in terms of two thousand dollars worth and five hundred dollars of it hadn’t been any good or hadn’t been paid for, or something or other owed the other five hundred.” That was all he could recall and he could not remember who said what. Shortly after Burthardt left, Gale Dawson went to the kitchen to find out when the two men intended to join the others. It was then approximately 10 minutes to 9. They told her that they would be out in a little while. However, she stated that while she was there, she heard the defendant "talking about cocaine, saying that he had three, and I don’t know how they have it. He just mentioned three and one had gone bad. He lost money, and Cliff said to him 'No you didn’t. You made money.’ ”
Both Dawson and Burthardt stated that the two men were conversing in normal tones. And when the prosecutor suggested that they were arguing, Dawson stated "I would consider it more a disagreement than an argument.” In fact none of the witnesses had ever heard the defendant and Mendell "argue” about anything.
At approximately 9 o’clock a loud popping sound was heard coming from the kitchen. Mendell then staggered into the living room holding a bloody hand against his neck. According to Burthardt and Dawson* he said "[w]hat did you shoot me with?” to which the defendant replied that he did not mean to do it "I was just showing it to him” or "I’m sorry. I just wanted to show it to him.” Burthardt testified that the defendant got down on his knees beside Mendell, who was then on the floor, and began crying and hugging him. He also stated that he saw a small revolver in the defendant’s hand which the defendant placed in his pocket before he left the house. Burthardt and Dawson stated that they had never seen a gun in Mendell’s possession. The weapon was never recovered.
That was essentially the case for the prosecution.
The defendant called several character witnesses and then testified in his own behalf. He stated that while he and *56 Mendell were in the kitchen they discussed his job and schooling and Mendell’s experiences with women in Pakistan. There was no discussion of drugs, and he denied using or selling drugs. He said that at about 9 o’clock he decided to leave in order to pick up his wife at a relative’s home. As he turned to put on his jacket, Mendell, who was then behind him said, "Petey, I got a nice piece to show you.” The defendant turned, saw the gun, and as he took it, it went off. He heard Mendell say "I’m hurt” or "I’m shot” and he replied, "Why did you have to show it to me.” He might also have said "I’m sorry”.
He conceded that at the time the shot was fired, the gun might have been in his hand, and that he probably carried it into the living room where he left it beside the body. But he denied bringing the gun to the house and claimed that it belonged to Mendell who collected small arms.
As noted, the jury found that the defendant recklessly caused the death of Clifford Mendell (Penal Law, § 125.15, subd 1). Recklessness, of course, is a higher or more culpable form of negligence (Penal Law, § 15.05, subds 3, 4), and a long "distance separates the negligence which renders one criminally liable from that which establishes civil liability” (People v Rosenheimer, 209 NY 115, 123). Before a person can be held criminally liable for negligently (Penal Law, § 125.10) or recklessly (Penal Law, § 125.15, subd 1) causing the death of another, it must be proven that he engaged in conduct which involved a "substantial and unjustifiable risk” of death and constituted "a gross deviation” from the standard of conduct or care that a reasonable person would observe in the situation (Penal Law, § 15.05, subds 3, 4; see, also, Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 15.05). The defendant’s awareness of the risk determines the degree of culpability. If he failed to perceive the substantial and unjustified risk of death inherent in his act, he is guilty of criminally negligent homicide (Penal Law, § 125.10). But if he was aware of the grave risk of death and acted in disregard of it, he acted recklessly (Penal Law, § 15.05, subd 3) and is guilty of manslaughter in the second degree (Penal Law, § 125.15, subd 1).
The People’s theory, at trial and on appeal, is that the defendant "threatened the deceased with a gun he had brought to the house completely disregarding the danger of such action.” Undoubtedly this would constitute reckless conduct within the meaning of the statute (cf. People v Stanfield, *57 36 NY2d 467). The question is whether there is sufficient evidence to support the theory.
We must of course assume that the jury credited the People’s witnesses and thus must view the facts most favorably to the prosecution (see, e.g., People v Benzinger, 36 NY2d 29, 32). But since no one other than the defendant witnessed the shooting and he denied brandishing the weapon, the People’s case depends solely on circumstantial proof. It is familiar law that when the People rely exclusively on circumstantial evidence to establish guilt beyond a reasonable doubt, "the facts from which the inference of the defendant’s guilt is drawn must be established with certainty—they must be inconsistent with his innocence and must exclude to a moral certainty every other reasonable hypothesis” (People v Bearden, 290 NY 478, 480; People v Cleague, 22 NY2d 363, 365-366). Circumstantial evidence "is of no value if consistent with either the hypothesis of innocence or the hypothesis of guilt. It is not enough if the hypothesis of guilt will account for all the facts proven” (People v Suffern, 267 NY 115, 127; see, also, People v Lewis, 275 NY 33; People v Foley, 307 NY 490).
It is undisputed that the two men were alone in the room when the shot was fired. From the statements they allegedly made at the time, as well as the defendant’s own trial testimony, the jury could conclude that the defendant had his hand on the weapon when it discharged. And it would appear that one or both of the men were at least negligent in the handling of the revolver. But there is nothing which leads inescapably to the conclusion that the defendant was responsible or that his conduct, if negligent, constituted "a gross deviation from the standard of conduct that a reasonable person would observe in the situation” (Penal Law, § 15.05, subds 3, 4).
True, there was testimony that there was a disagreement and it is possible that this heated into an argument and that the defendant seized the weapon in order to threaten Mendell. But it is equally possible that the disagreement remained a calm discussion and that the production of the weapon was totally unrelated, perhaps displayed, in friendship and carelessly discharged as the result of ordinary negligence. Certainly the undisputed evidence concerning the relationship between the two men and their conduct throughout the discussion is not inconsistent with this hypothesis. Thus even assuming that the weapon was in the defendant’s hand at the time *58 of the shooting, neither this circumstance nor any other factors in the case compels the inference that the manner in which the defendant handled the weapon, if negligent, rose to the level of a criminal act (cf. People v Bearden, supra, p 482).
One other point deserves brief discussion. The defendant claims that he was denied a fair trial because he was constantly confronted with evidence that he was somehow involved in selling drugs. This was first introduced into the case when the People sought to prove that prior to the shooting the defendant and Mendell were involved in an argument over drugs. Of course proof that there was an argument of some sort would have been sufficient. However the trial court has the discretion to admit some evidence of other crimes when it is needed as background material (see, e.g., People v Stanard, 32 NY2d 143) and the People’s case might well have been prejudiced if their witnesses had given only generalized accounts of an argument without supplying any particulars.
The defendant’s primary complaint is that Charles Burthardt was also permitted to testify that Mendell had previously smuggled large quantities of drugs into the country. The prosecutor claims that this could not have prejudiced the defendant because it was never connected to him. But in view of the other testimony concerning the discussion between the two men, Burthardt’s statement about Mendell’s activities placed the defendant squarely in the midst of a large scale and apparently international drug traffic.
This evidence had little or no probative value. At best it merely supplied background to the background. On the other hand the prejudice to the defendant was manifest.
The defendant was on trial for recklessly causing the death of his friend. There was no intent to kill or even injure alleged or proven and the crime charged involved a low degree of criminal culpability. But the evidence of the uncharged drug activities involved the fullest measure of evil intent and culpability—crimes, in fact, which are so reprehensible and inexcusable that the Legislature has seen fit to impose the maximum penalties (see, e.g., People v Broadie, 37 NY2d 100). Obviously this testimony could radically alter the jury’s conception of the case and the defendant’s culpability. In short this is a classic example of a case where the prejudice to the defendant outweighed the probative value of the evidence (see, e.g., People v McKinney, 24 NY2d 180).
Thus, even if the evidence had been sufficient to sustain the *59 conviction, the defendant would be entitled to a new trial. However, since we have found that the evidence is insufficient to sustain the conviction for the crime charged, or any included offense, the indictment must be dismissed.

 Carol Tsiamis said that she saw and heard nothing after Mendell entered the living room. Apparently she immediately escorted Gale Dawson’s 10-year-old daughter out of the room and remained with her until the police arrived.